**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**
   **Plaintiff,**

v.             **Criminal Action No: 2:09CR19**

**DANIEL ALFRED CORICA,**
   **Defendant.**

## AMENDED REPORT AND RECOMMENDATION/OPINION TO CORRECT SCRIVENER ERRORS

On the 29th day of September, 2009, came the defendant, Daniel Alfred Corica, in person and by Richard W. Shryock, Jr., his attorney, and also came the United States by its Assistant United States Attorney, Stephen Warner, for a hearing on Defendant's Motion to Suppress, which motion was filed on September 14, 2009 (Docket Entry 12). The United States filed its Objection to the Motion on September 25, 2009 (Docket Entry 14).[1] The matter was referred to the undersigned United States Magistrate Judge on August 14, 2009, by United States District Judge Robert E. Maxwell (Docket Entry 4).

### I. Procedural History

On November 28, 2006, Defendant was arrested after a traffic stop and charged in a criminal complaint filed in the Magistrate Court of Randolph County, West Virginia, with one count of Possession of Marijuana with Intent to Distribute. On or about the 30th day of November, 2006, the Randolph County Magistrate Court scheduled a preliminary hearing for the 18th day of December 2006. On or about the 11th day of December, 2006, the State, by its Assistant Prosecuting Attorney, Michael W. Parker, filed a Motion to Dismiss without prejudice with the Randolph County

---

[1] The undersigned notes that the U.S. Attorney's Response was filed a day late.

Magistrate Court on the ground that the State planned to pursue indictment. On or about the 18th day of December, 2006, Richard Shryock, counsel for Defendant in both the prior State case and current Federal case, filed Defendant's Motion in Opposition to the State's Motion to Dismiss with the Randolph County Magistrate Court. On or about the 18th of December, **2006**, Magistrate Rick George entered an Order dismissing this matter from the Randolph County Magistrate Court stating that this matter was dismissed by the Assistant Prosecutor. Magistrate George found that Defendant was denied a right to a preliminary hearing, as required by West Virginia Rules of Criminal Procedure for Magistrate Courts as stated by Defendant in the Defendant's Motion in Opposition to State's Motion to Dismiss filed in the Randolph County Magistrate Court on the 18th of December, 2006.[2] The Prosecutor admitted in his Motion that the police report as well as WVSP Form 17A received by the State in this matter omitted relevant facts regarding the motives of the State Police in conducting an apparent pretextual stop. Omission of material facts regarding the stop and subsequent search of Defendant, facts known to counsel, and facts known to the West Virginia State Police, rendered the case unprosecutable. (See Defendant's Exhibit C attached to his brief).

According to Defendant's counsel, he was then contacted by AUSA Warner, and informed that the Federal Government was going to be prosecuting Defendant. This never occurred, however. Instead, on October 27, 2008, nearly two years after Defendant was arrested on the State charges, the State of West Virginia indicted Defendant on the charge of possession with intent to deliver marijuana. He was arraigned by the Circuit Court of Randolph County, West Virginia, on November 13, 2008. According to counsel, the State provided incomplete discovery on or about January 10,

---

[2]Defendant's counsel states that he had subpoenaed all the State Troopers present at the scene of the arrest to appear at the preliminary hearing.

2009. Defendant moved to dismiss the States charge based upon incomplete discovery. The motion was denied but the State was ordered to provide complete discovery within seven days. On or about January 22, 2009, the State provided Defendant additional discovery including a police report prepared by Trooper J.E. Kopec. The report still did not mention a CI being utilized in the case. Said report, dated **February 9, 2007**, 2 ½ months after the arrest, simply repeated the original story of a routine traffic stop. On January 29, 2009, Defendant filed a second motion to dismiss based upon the State's failure to provide Defendant with complete discovery and failure to provide impeachment and exculpatory material.

On January 28, 2009, the State filed a motion to dismiss the charge against Defendant without prejudice. The State Prosecutor stated in his Motion to Dismiss:

> In a hearing held on the 15th day of January, 2009 on this matter, Trooper J.E. Kopec, with the West Virginia State Police, agreed with the proffer of defense counsel, Richard w. Shryock, J., on all counts, including the allegation that the traffic stop was pre-textual based upon information from a confidential informant. Further, the confidential informant, who is currently in federal custody, has admitted to planting drugs on other suspects and defendants to the West Virginia State Police. The Prosecutor therefore moved the State to dismiss the matter without prejudice "in order to allow the West Virginia State Police to prepare an accurate report including all relevant facts incident to Defendant's traffic stop and subsequent arrest. Upon the receipt of the same, the State will review and consider such information in determining whether this matter is ripe for presentation to a future Grand Jury.

(See Defendant's Exhibit C, attached to Motion).

On the 9th day of February **2009**, Honorable Jaymie Godwin Wilfong, Circuit Court Judge for the 20th Judicial Circuit Court in Randolph County, West Virginia, heard the State's Motion to Dismiss as well as Defendant's Motion to Dismiss. Judge Wilfong held as follows:

> The State presented it's [sic] Motion to Dismiss based on it's [sic] ethical obligation not to prosecute a case that lacks probable cause and violates the Defendant's Fourth Amendment Rights. The Defendant raised no objection to the State's Motion and

joined the State's Motion, as well as filing his own Motion to Dismiss on the same grounds. The Court then inquired as to the sentiment of West Virginia State Trooper, J.E. Kopec, who informed the Court that he objected to the dismissal of this matter. The Court[] acknowledged Trooper[] Kopec's objection but FINDS the dismissal without prejudice is proper in this case based upon the State's request. The Court hereby GRANTS the State's Motion and ORDERS that this matter be and is hereby DISMISSED WITHOUT PREJUDICE.

On or about August 12, 2009, close to three years after Defendant's initial arrest, Defendant was indicted by a Grand Jury sitting in the United States District Court for the Northern District of West Virginia, on the charge of Possession of Marijuana with Intent to Distribute. Defendant was arraigned on August 27, 2009. According to counsel, he received discovery from the Government on September 3, 2009, which included a new police report prepared by Trooper Kopec dated April 27, 2009, 2 ½ years after Defendant's arrest. The second report bears no indication that it is a supplemental report and makes no mention of the original report prepared on February 9, 2007. The new report contains additional information, which will be discussed below.

Defendant timely filed his Motion to Suppress on September 14, 2009. The United States filed its Objection to the Motion one day late, on September 25, 2009. On September 25, 2009, the undersigned United States Magistrate Judge ordered the parties to provide additional records, including records from the original traffic stop. The undersigned further ordered that all five State Troopers involved in the traffic stop be present for the hearing.

## II. Contentions of the Parties

Defendant contends the warrantless search of his automobile on November 28, 2006, violated his constitutional rights because:

1. The police stop on November 28, 2006, was pretextual;

2. The police lacked a reasonable suspicion to stop Defendant because his stop was based

4

on incomplete and unreliable information from a confidential informant;

3. No traffic violation occurred that would justify the stop;

4. The police officers' versions of the events of November 28, 2006, are not credible;

5. There was no consent to the search; and

6. The detention of Defendant and his vehicle for 49 minutes as well as the subsequent search violated Defendant's Fourth Amendment rights.

The Government contends:

1. The Constitutional reasonableness of a traffic stop does not depend on the actual motivation of the officer making the stop;

2. Temporary detention for a simple traffic violation is consistent with the Fourth Amendment's prohibition against unreasonable searches and seizures regardless of whether a reasonable officer would have been motivated to stop the vehicle for the violation of the traffic law;

3. Defendant voluntarily consented to the search;

4. Defendant made voluntary, spontaneous, inculpatory statements;

5. Defendant did violate a State traffic law providing the officer with probable cause for the stop; and

6. The delay in waiting for the arrival of the drug-sniffing dog was *de minimus*, and thus was not unreasonable in violation of Defendant's Fourth Amendment rights.

### III. Statement of Facts

The Court received the testimony of five witnesses under oath, to wit: West Virginia State Troopers Charles Trader, Christopher Snodgrass, J.R. Fletcher, Jacob Kopec, and Thomas Yanero. The Court also admitted into evidence four exhibits, including the communications log sheet from

the date of the arrest, transcripts of the State and Federal Grand Jury proceedings, Tpr. Kopec's original 193 report, and Tpr. Kopec's original 17A report and "supplemental" (although not designated as such) 17A report.

From the evidence presented, the Court makes the following findings of fact:

On November 28, 2006, Cpl. Christopher Snodgrass was doing a drug investigation in the Dry Fork, Randolph County, West Virginia area. He and Sgt. Bennett were with a confidential informant ("CI"), arranging a controlled buy of marijuana from a target in Davis. They were searching the CI's vehicle prior to making the controlled buy. They saw Defendant, Daniel Corica, drive past, headed toward Elkins, West Virginia. They attempted to evade him, because Defendant knew the CI, but Cpl. Snodgrass believed Defendant looked right at them. Cpl. Snodgrass contacted Sgt. Stalnaker, who advised him to see if he could get an officer to follow Defendant, in order to catch him in a traffic violation so he could be stopped. They assumed because of the direction from which Defendant was driving, that he would have drugs. Cpl. Snodgrass testified that the CI was not a reliable person, but that nothing the CI said influenced any of his decisions that day.

At about the same time, Sgt. Charles Trader received information regarding Defendant, Daniel Corica, possibly transporting drugs through Elkins, Randolph County, West Virginia. He proceeded to town along with Tpr. Kopec. Tpr. Kopec was driving. They proceeded toward Harman, looking specifically for Defendant. They passed him going in the opposite direction. They had no probable cause to stop him at that time, so they turned around and followed him, hoping to witness a traffic violation in order to establish probable cause to initiate a traffic stop. Sgt. Trader was "very familiar" with Defendant, and his reputation as a drug trafficker.

At about the same time, Tpr. J.R. Fletcher was out on Rt. 33, when he was advised by Sgt.

6

Stalnaker that Defendant may be carrying drugs in his car. He was directed to observe the vehicle to see if Defendant committed any traffic violations for which he could stop him. He saw Defendant's vehicle coming into town. He turned around to get behind him to watch for violations. Tpr. Fletcher testified he followed Defendant's vehicle driving "bumper-to-bumper," He defined bumper-to-bumper as being 15 to 20 feet away. Defendant did not violate any laws. The two then stopped at a red light at an intersection. Tpr. Fletcher was immediately behind Defendant at the light. There was other traffic at the intersection. When the light turned green Defendant proceeded straight through, onto 11th Street. He turned on his left turn signal to go into a car wash. The traffic in the lane going the opposite direction (which he had to cross to get to the car wash) was backed up and blocking his way into the car wash. He stopped for 10 - 15 seconds to see if someone would let him in, but no one did. He then went ahead and immediately turned right without signaling. At that point Tpr. Fletcher turned on his lights. Tpr. Fletcher testified that there were no other cars– that everything was backed up in the other lane. No one was ahead of Defendant, and no one was between him and Defendant. The Court specifically asked Tpr. Fletcher:

Q: As you were following Mr. Corica on, I believe it was, 11th Street, and as he made the turn to the right, without making a signal either by his hand or with his signal lights, what, if any, traffic did you see that may be affected by him making that signal-less turn?

A: I do not recall any traffic that would have been affected by that.

The AUSA then asked Tpr. Fletcher the following series of questions:

Q. How far behind Mr. Corica were you when he turned right onto Delaware?

A: Ten to fifteen feet.

. . . .

Q: So how far from the stop light where traffic was backed up was the turn onto Delaware made?

A: From the stoplight to Delaware, it could be 400 feet, 450 maybe.

Q: How many cars were in the other lane, going the other direction, in that span of roadway?

A; The traffic was stopped from the intersection clear down to the City Garage, which encompassed the car wash itself, also.

Q: How far from Delaware Street then was the last car in the other lane?

A: I'm pretty sure if I can recall, there was a traffic light here [gesturing] and then Delaware was right there [gesturing]. Cause there's always traffic on 11th Street, and when it backs up, it backs up clear past the bridge.

The AUSA then directed Tpr. Fletcher not to use gestures in describing his answers as they could not be recorded. He then asked:

Q; How far from the Delaware Street turn was traffic in the other lane backed up?

A: In that intersection.

Q: If you could pick, like, the last car in that lane?

A: Right at the edge of, in that intersection.

Q: I know, but, how far from Delaware Street was the last backed-up car?

A: It was in the Delaware Street intersection.

Q: How far away from that turn was the nearest other vehicle?

In response, Tpr. Fletcher testified that there were cars in the Kroger's parking lot on the corner of Delaware and 11th Street. The car wash was also full. He could not recall how many cars were backed up in the other lane, and did not recall if anyone was behind him. He did not recall if he had

8

needed to brake when Defendant turned.

Tpr. Fletcher testified that there were a lot of cars at the intersection. It was work quitting time and although he did not remember how much traffic was there precisely, he testified there was "always" traffic there.

Defendant stopped when Tpr. Fletcher activated his lights. Tpr. Fletcher pulled in behind him. He notified the other troopers, Trader and Kopec, via radio that he was initiating a traffic stop on Defendant. As Kopec and Trader pulled in, Fletcher was exiting his vehicle. Defendant was still in his vehicle.

All three officers approached Defendant's vehicle. Defendant rolled down his window, and all three officers smelled a "very pungent" odor of green (unburnt) marijuana. They proceeded with the traffic stop. Tpr. Fletcher testified Defendant was "in a nervous state." They saw within plain view on the back seat of the vehicle two boxes wrapped in duct tape. The packages were suspicious. As Tpr. Fletcher testified, packages wrapped in that manner were consistent with the transportation of illegal narcotics. There were also other things in the car, including Christmas packages. Defendant was asked whether there were any narcotics in the car or if he was smoking marijuana, and he replied "No." Tpr. Fletcher issued Defendant a warning citation for failure to use a turn signal or for making an improper turn (he could not recall precisely which). Defendant was asked for consent to search his vehicle. At first he agreed, but after filling out the consent to search form, decided not to consent. At that point Tpr. Fletcher called for the K-9 unit.

Defendant was informed he was free to leave but his car would be detained until the K-9 unit arrived. Defendant then began to walk away, but Sgt. Trader either called him back or had him called back. The other officers did not know why, but Sgt. Trader testified that Defendant became

9

irate while walking away, and he then decided to call him back. Sgt. Trader testified that he had had many occasions to observe Defendant, and he had never seen him become irate. He decided to detain him for safety reasons. At that point Sgt. Trader read Defendant his Miranda rights. Defendant was placed in one of the cruisers and detained for approximately 45 minutes, until the K-9 unit arrived.

Sgt. Yanero testified he was on duty with his dog in Braxton County when he received the call to bring the canine to Elkins for a traffic stop. It took him about 45 minutes to arrive in Elkins, solely because of the distance. He did not stop anywhere or cause any delay. When he arrived, the dog "alerted" at the back passenger compartment of Defendant's vehicle.

Tpr. Kopec completed the criminal complaint. He did not mention in it the reasons they were looking for Defendant. He also completed a form 193 (an initial report), which also did not mention the reason they were looking for Defendant. He completed a long form report 17A in February 2007, which still did not mention the reason they had been looking for Defendant. He testified that the reason for the omission in the four documents was that they were "pretty much cut and pasted." He was rushed and wasn't very thorough. He was busy. He just did not think to put it in there. He also testified that none of this work was reviewed at the time. He had not even done the 17A at first, because Cpl. Snodgrass was taking over. He did his first 17A when the case got "kicked back to State court." His sergeant told him the case was going back to State court and "you need to get that 17A out 'yesterday.'" He completed the first 17A and took it to the State prosecutor's office without it having been approved or signed by anyone else

Cpl. Snodgrass testified that he wrote out an affidavit for a search warrant on November 30th, 2006, even though the traffic stop and drug arrest of Defendant was not his case. In the affidavit he

made no mention of seeing Defendant on the 26th while he was with Sgt. Bennett and the CI. He did not include any information regarding his contact with Sgt. Stalnaker regarding Defendant. His affidavit refers only to Tpr. Fletcher initiating a routine traffic stop. The affidavit contains no mention of the CI or Stalnaker. He testified that his reason for the omission was that that information referred to a Federal case, whereas the traffic stop and drug arrest were part of a State case and it was seeking a State warrant. He felt that including those facts would hinder the Federal case, and he therefore was protecting that information.

Tpr. Kopec testified at the State Grand Jury proceedings on October 27, 2008. He did not mention in his testimony the communication from Sgt. Stalnaker, the CI, or mention any reason the officers had been looking for Defendant. Everything Tpr. Kopec had written or testified to up to this point omitted any mention of what happened prior to the traffic stop. He explained that he figured all the prior knowledge stuff would come in during trial. He did not think it was needed before then. He also testified that he believed defense counsel was already aware of the information, because counsel had told him he did not put it in and "that's not good."

Cpl. Snodgrass testified he was asked to write a new memorandum in February 2009, in which he was to include specifically that he saw Defendant traveling while he was with the CI, and regarding his contact with Sgt. Stalnaker.

Tpr. Fletcher testified that he was first asked to prepare paperwork regarding the traffic stop and arrest on March 5, 2009. He was directed to do so by his Sergeant. He testified no one had told him NOT to produce a report before that date – he simply had not.

Tpr. Fletcher did not complete any paperwork pursuant to the traffic citation until March 5, 2009, 2 ½ years after the incident. He did not believe that unusual. Trooper Kopec prepared a new

written report on April 27, 2009. This report, 2 ½ years after the traffic stop, was the first that included the events prior to the traffic stop. This was also after the State charges had been dismissed due to the State's failure to provide discovery regarding these events. The trooper's Captain then reviewed his 17A and told him he needed to put the omitted information in it. The 17A was written without indicating that it was "supplemental."

In August 2009, a Trooper testified in front of the Federal Grand Jury. The supplemental information was included in the trooper's testimony.

## IV. DISCUSSION

As a threshold matter, there is no dispute that but for the alleged traffic violation, the stop would have been pretextual, and the undersigned so finds. There is also no dispute that there was no probable cause to stop Defendant prior to the alleged traffic violation, and the undersigned so finds.

The Fourth Circuit has adopted an objective test for assessing whether a vehicle stop for a minor traffic violation was pretextual: [I]f an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity." United States v. Kellam, 568 F.3d 125, 136 (4th Cir. 2009) citing United States v. Hassan El 5 F.3d 726, 730 (4th Cir. 1993).

Although Defendant may have at first consented to a search, the undersigned also finds he either did not consent or withdrew his consent before any search occurred. The remaining issues are whether a traffic violation occurred that would justify the stop; and that the detention of Defendant and his vehicle for 49 minutes as well as the subsequent search violated Defendant's Fourth

12

Amendment rights. As to both issues, Defendant argues that the evidence and particularly the history of this case indicate that the officers' versions of the events of November 28, 2006, are not credible.

**A. The Traffic Stop (<u>Clower v. WV DMV</u>)**

The threshold issue is: Did Defendant's turn onto Franklin Street from Route 11 without first signaling his intention to do so violate W.Va. Code 17C-8-9 justifying the stop made by Trooper Fletcher.

In determining whether Defendant's turn onto Franklin Street violated the road law of West Virginia (17c-8-9), the undersigned looks for guidance from the West Virginia Supreme Court of Appeals' case of <u>Clower v. West Virginia Department of Motor Vehicles</u>, 223 W.Va. 535, 678 S.E.2d 41 (2009) holding: "[A] motorist who makes a turn at an intersection without first using a turn signal to notify others of the intent to make the turn does not violate the provisions of <u>W.Va. Code, 17C-8-9</u>, read in *para materia* with the provisions of <u>W.Va. Code, 17C-8-8a</u> [1999], where no other traffic may be affected by the movement of the motorist's vehicle." The <u>Clower</u> Court also held: "[P]olice officers may stop a vehicle to investigate if they have an articulable reasonable suspicion that the vehicle is subject to seizure or a person in the vehicle has committed, is committing, or is about to commit a crime[.]" "In evaluating whether or not particular facts establish reasonable suspicion, one must examine the totality of the circumstances, which includes both the quantity and quality of the information **known by the police.**" (Citing <u>State v. Stuart</u>, 192 W.Va. 428, 452 S.E.2d 886 (1994))(emphasis added).

The Court in <u>Clower</u> determined that the state policeman who stopped Clower for turning without first giving a signal and thereafter discovered that Clower was driving with a blood alcohol level of .182, had no basis to make the stop in the first instance because there was no other traffic

13

on the road at 1:19 am that may have been affected by Clower's turn. Furthermore, the State Trooper was some two blocks behind Clower when the turn was made and could not possibly have been affected by the turn.

The subject case is factually distinguishable from Clower. The stop of Corica took place at approximately 3:30 pm. The traffic on 11th Street in Elkins, WV was busy because it was quitting time. The traffic in the lane of 11th Street opposite from the lane in which Corica and Trooper Fletcher were traveling was backed up 400-450 feet from the traffic light to the edge of Franklin Street. The traffic precluded Corica from turning left into the car wash in accord with his originally signaled intent. Trooper Fletcher was 10 to 15 feet behind Corica when he turned on to Franklin Street instead of the more than two blocks the state trooper was behind Clower when he made his turn.

Notwithstanding Trooper Fletcher's inability to recall and articulate any specific traffic that would have been affected by Corica's turn in response to the Court's examination some three years after the fact, the undersigned finds there was traffic within feet of the area of the intersection of 11th Street and Franklin Street that may have been affected by Corica's turn. The undersigned further finds that Trooper Fletcher's hearing testimony shows he was obviously aware of the presence of that traffic at the time of the turn in question.

The undersigned again turns to Clower for the Court's interpretation of the meaning behind the statutory requirements: "[I]t is clear that the Legislature sought to require a motorist to warn others of the motorist's intent to make a turn. It is equally clear that the Legislature understood that in some situations a turn signal would serve no purpose and the Legislature specifically defined such a situation as being when 'no other traffic may be affected by the movement.' A clear example [of]

14

this latter situation is where a driver is on an isolated country road, with no other cars or pedestrialns in sight, and the driver turns at an intersection without using a signal. A driver in such an example clearly would not have violated *W.Va. Code,* 17C-8-9 as there was no other person who could have benefitted from a turn signal." Clower, *supra* at 46. The test is not whether the officer can remember it at a hearing or trial. Instead, it is a more objective test of whether the circumstances that confronted the officer at the time of the event justify the action taken. In the instant case, the trooper was close enough to Corica that he, the trooper, may have been affected. The traffic going in the opposite direction on 11th Street and which was backed up from the stop light to Franklin Street may have been affected. There is no dispute that Corica failed to give a signal of his intent to turn right onto Franklin Street for the benefit of the other motorists in the vicinity. Accordingly, probable cause existed that Corica was in violation of the provisions of W.Va. Code, 17C-8-9 when read in *para materia* with the provisions of W.Va. Code, 17C-8-8(a) at the time he made the turn onto Franklin Street without signaling his intern to do so. United States v. Kellam, *supra* at 136.

**B.     Credibility**

While it was interesting to hear about and follow the machinations of the case in state court where it appears there was a reluctance to prosecute Corica because of the clearly pre-textual nature of the stop but for the traffic violation and the issue of an unreliable CI, the case is no longer in state court and much of those machinations are irrelevant here.

The federal court is no longer required to consider the pre-textual rationale of the officers in stopping Corica provided they observed him violating a traffic law of the state in which he was driving. "The temporary detention of a motorist upon probable cause to believe that he has violated the traffic laws does not violate the Fourth Amendment's prohibition against unreasonable seizures,

even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective." Id. and Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d89 (1996).

Having already decided Trooper Fletcher had probable cause to believe Corica violated the road law of West Virginia by turning right onto Franklin Street without first signaling his intent to do so, the undersigned does not have to consider the motives of the officers that preceded the stop (ie.: whether the officers relied on a wholly unreliable CI in suspecting Corica was transporting drugs). Even if considered, the evidence is that the presence of the CI did not play any role in the decision to follow Corica hoping he would make a mistake for which he could be stopped.

"Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest, and when these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." Arizona v. Gant, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

In the instant case the police had no basis to search Corica's car in the absence of a warrant based on some belief that the car would contain evidence of the offense of arrest (traffic stop for turning without signaling). Once Corica was taken into custody and placed in the cruiser of one of the officers at the scene, he was no longer within reaching distance of the passenger compartment of the car justifying a search of its interior.

However, by the time Corica was placed in the police cruiser, three separate police men had

smelled the odor of green marijuana emanating from the car; could see the suspicious package wrapped in paper and duct taped in plain view on the back seat; and had called for an officer to bring a drug sniffing dog to the scene. "'[I]f an officer smells the odor of marijuana in circumstances where [he] can localize its source to a person, the officer has probable cause' to arrest for marijuana possession." . United States v. Kellam, *supra* at 136 citing: United States v. Humphries, 372 F.3d 653, 659 (4th Cir. 2004).

Notwithstanding the delay in finalizing reports, the undersigned finds the testimony of the officers credible with respect to the stop, and the smelling of the odor of marijuana emanating from the passenger compartment of Corica's automobile.

**C.    Delay**

Corica's argument that he was subjected to an unreasonable delay while the police called for and awaited the arrival of a drug sniffing dog is without merit.

First, once the police smelled the odor of marijuana emanating from the passenger compartment of Corica's car and could localize it to Corica and his car, they had probable cause for arrest for marijuana possession and did not have to wait for the drug dog. *Id.*

Second, "[T]he Fourth Amendment forbids unreasonable searches and seizures. Whether or not a seizure is unreasonable depends on its intrusiveness, .... Whether or not a search or seizure is so intrusive as to violate the Fourth Amendment depends on all the circumstances of the case, ..., and not usually on any hard and fast rule. Among the circumstances which must be considered are the duration of time the suspect is delayed by the stop, ...; whether the police acted diligently, ...; whether the detention of the subject of the search was unnecessarily prolonged, ...; whether the

authorities make it absolutely clear that they plan to reunite the suspect and his possessions at some future time, and how they plan to do it, ...; and the importance of the governmental interest alleged to justify the intrusion, ...." United States v. Alpert, 816 F.2d 958, 964 (1987) (internal citations omitted).

In the instant case, the police called for the drug dog as soon as it became apparent that Corica was refusing consent to search or had withdrawn the verbal consent to search he had previously given. Sgt. Trader called Sgt. Yanero to bring his drug dog. Sgt. Yanero was on road patrol in Braxton County at the time he received the call to bring his dog to Elkins. Sgt. Yanero's uncontradicted testimony was that he drove straight to Elkins, a travel time of approximately 45 minutes. Corica was only detained because he became agitated when he was told he could leave but his car had to stay while the police waited for the drug dog. Sgt. Trader explained he was concerned over Corica's agitation and feared Corica would leave and return with a weapon. The governmental interest of determining whether the odor emanating from Corica's car was marijuana as suspected clearly overrides the imposition of a 45 minute detention of Corica to give time to get the drug dog to the scene. Under the totality of the circumstances, the undersigned finds the 45 minute wait and detention of Corica during the wait was reasonable.

For docketing purposes and based on the foregoing, the United States' Motion to Bifurcate is **DENIED as MOOT**.

## V. Recommendation

For the reasons herein stated, the undersigned accordingly recommends Defendant's motion to suppress (Docket Entry 12) be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this AMENDED

REPORT AND RECOMMENDATION/OPINION TO CORRECT SCRIVENER ERRORS, file with the Clerk of the Court written objections identifying the portions of the AMENDED REPORT AND RECOMMENDATION/OPINION TO CORRECT SCRIVENER ERRORS to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the AMENDED REPORT AND RECOMMENDATION/OPINION TO CORRECT SCRIVENER ERRORS set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this AMENDED REPORT AND RECOMMENDATION/OPINION TO CORRECT SCRIVENER ERRORS to counsel of record.

Respectfully submitted this 7th day of October, 2009.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE